Harland W. Braun, Esq.  [CASBN 41842]
BRAUN & BRAUN LLP
10880 Wilshire Boulevard, Suite 1020
Los Angeles, California 90024
Telephone:  (310) 277-4777
Facsimile:   (310) 507-0232
Email:  harland@braunlaw.com

Attorneys for Defendant
WENDELL MARK STREET_____

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. CR 5: 18-00047-GW |
| Plaintiff, | **DEFENDANT WENDELL MARK STREET'S SENTENCING POSITION** |
| v. | |
| WENDELL MARK STREET, | |
| Defendant. | Hearing Date:  September 18, 2023<br>Time:  8:00 a.m.<br>Location:  Courtroom of the Honorable George H. Wu |

## INTRODUCTION

Wendell Mark Street believes that this sentencing is a waste of time. The government has offered no excuse for waiting five years to file a simple one-day undercover case. Nor has the government explained to the court why the State of California's action to revoke Dr. Street's medical license and his voluntary surrender of his license has not protected the public. Wendell Mark Street is a 70-year-old former physician who is in extremely poor health and abandoned his professional license because of a serious gambling addiction.

The sales that lead to this Indictment occurred in August of <u>2013</u> and the federal charges were brought in <u>2018</u>. While the federal authorities dithered over a case that they

Street.8

now call important, the State of California was not negligent and followed up relatively quickly.

The Attorney General of the State of California brought an action against Dr. Street's medica license in February of 2015. Dr. Street realized that his medical judgment had been impaired by his gambling addiction and gave up his medical license in exchange for an assurance from the Attorney General that there would be no criminal prosecution.

Unfortunately for Dr. Street, he lives in a jurisdiction in which citizens are subjected to both state and federal prosecution without any serious attempt at coordination. Because Dr. Street was removed from the practice of medicine by the State of California, he no longer was a threat to anyone's health but the federal government apparently in order to chalk up another "victory," brought this case at the very last minute against Dr. Street.

Rather than repeating Dr. Street's history, attached to this memorandum are Dr. Street's statement of his life history, his medical condition, and his financial resources.

## ATTEMPTS AT REHABILITATION

As the court knows, the use of oxycontin has been very widespread in the United States and subject to much litigation. Unfortunately, at a very early stage, Dr. Street attended seminars sponsored by pharmaceutical companies, which indoctrinated doctors that oxycontin was an efficient painkiller but was not addictive. Unfortunately, Dr. Street believed what he heard but this false information in no way justified his giving oxycontin to patients without medical indication.

After the raid involved in this case, Dr. Street attended two (2) seminars at the UC San Diego School of Medicine, in which he attempted to correct his prescribing practices. See attached certificates. Unfortunately, neither of these courses helped save his license. Dr. Street's medical degree stands out as a singular achievement for someone from his background; however, he makes no excuses for his neglect of medical ethics.

/

BRAUN & BRAUN LLP
10880 WILSHIRE BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90024

2.

Street.8

DEFENDANT WENDELL MARK STREET'S SENTENCING POSITION

//

## A GAMBLING DISORDER

Although the pretrial report recognizes that Dr. Street has a gambling problem, the court should understand that with respect to some people a gambling disorder essentially takes over their lives. Attached to this pleading is the diagnostic criteria for a gambling disorder. The court might be familiar with some others who have had gambling problems and such a problem is then chronicled in the movie, "The Gambler.". Dr. Street lives in Las Vegas, which has many people who innocently came to Las Vegas, and realized they had a gambling addiction and never were able to escape. See attached article on "Gambling Addiction."

## THE ALLEGED QUANTITY OF OXYCONTIN DESCRIBED

As the pretrial service report indicates, Dr. Street only went to his medical office two days a week. Unfortunately, Dr. Street did not supervise the employees at the medical office and as the report indicates, prescriptions were given out by personnel working at the office when Dr. Street was not present. As a medical doctor, this does not excuse his neglect but to ascribe multiple prescriptions to Dr. Street in a criminal case when he did not prescribe the medication seems unfair.

## MEDICAL CONDITION

The pretrial report focuses on the extremely poor medical condition of Dr. Street. The two aortic aneurysms which seem to be untreatable are the most serious since they could explode at any time killing Dr. Street. The other medical conditions dictate that Dr. Street is disabled and unable to work and simply subsists on his very meager social security check. See again the attached statement from Dr. Street.

/

/

BRAUN & BRAUN LLP
10880 WILSHIRE BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90024

3.

Street.8

1

2

## MILITARY SERVICE

Although Dr. Street's 17-year military service does not excuse his conduct in this case, it certainly is not a negative and his volunteer service in the military should be taken into consideration. Dr. Street had the good sense to decline the "invitation" by the government to go to Afghanistan where half of his unit was killed. The government did not learn from the experience of the British Empire or the collapse of the Soviet Union. It did learn after 20 years of fruitless combat.

## THIRD PARTY DETERRANCE

The Government's position seems to be that anything less than a custody sentence in Dr. Street's case will serve as an encouragement for other physicians to illegally prescribe oxycontin. If this were true, perhaps the Government can explain to the court why it took five (5) years to file a case in which the Government now claims that Dr. Street is a poor example for other physicians. The truth is that other physicians had never even heard of Dr. Street in Las Vegas and very few physicians would consider his loss of license a goal to be achieved by illegally prescribing oxycontin. The media has been full of lawsuits about the prescribing of oxycontin. It is unfortunate that with Government sponsorship, the pharmaceutical industry pushed oxycontin as a viable painkiller.

## INAPPROPRIATE SENTENCE

Section 383 requests the court to impose the minimum custody sentence consistent with the other guidelines. To be quite frank, Dr. Street's case is so old, and his gambling addiction is so compulsive that the guidelines really do not fit this case. It appears to counsel that Dr. Street's life is a mess and he is barely subsisting in his apartment in Las Vegas. Moreover, it is difficult to see how the expenditure of any public monies to

4.

Street.8

DEFENDANT WENDELL MARK STREET'S SENTENCING POSITION

BRAUN & BRAUN LLP
10880 WILSHIRE BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90024

incarcerate Dr. Street makes any sense since he basically will live quietly until he dies, and he is never again going to practice medicine.

## CONCLUSION

As stated before, this federal prosecution is a waste of time because the State of California and the Medical Board have already dealt with Dr. Street. The question the Government should answer  is what is the purpose for a five-year-old federal case on top of an economical and swift decision by the State of California? In fact, what is the purpose of having two jurisdictions handling the same conduct without any serious coordination? The only issue in this sentencing is whether Dr. Street should be incarcerated. There is no purpose to incarceration. And in any event, given his medical condition, he would have to be hospitalized at public expense.

Dated: Sept     11    , 2022          BRAUN & BRAUN LLP

By: _____

Harland W. Braun
Attorneys for Defendant
WENDELL MARK STREET

BRAUN & BRAUN LLP
10880 WILSHIRE BOULEVARD, SUITE 1020
LOS ANGELES, CALIFORNIA 90024

Street.8

5.

# WENDELL MARK STREET

Born January 26, 1952, Baltimore, MD to William and Annie Street.  Number seven of eight siblings

Reared in Baltimore and attended Public Schools there. Graduated High School 1970.

Universities / Colleges Attended 1972 thru 1977: University of Baltimore, Towson State University, Harvard University, Johns Hopkins University, and Morgan State University (graduated 1977 BS degree).

Graduated 1981 Medical College of Wisconsin - MD Degree

Internship, Anesthesiology Residency, and Critical Care Medicine / Pain Fellowship all completed at Johns Hopkins Univ. and Medical Center – 1981 – 1986 Baltimore, MD.

Clinical Instructor: Johns Hopkins University and Medical Center 1986 - 1987

Kaiser Fontana Medical Center – Anesthesiologist 1987

Kaiser Riverside Medical Center – Anesthesiologist 1987 – 1992

Commander, Medical Corp, US Naval Reserve 1984 thru 2005 – Honorable Discharge

Private Practice Pain Medicine: Riverside, Apple Valley, and Loma Linda, CA. 1994 – 2012

Private Practice Pain Medicine: Victorville, California 2012 - 2015

In 1987 I was the first fellowship-trained Pain Medicine Physician in California as well as one of the few in the United States at that time. My practice primarily focused on pain control and treatment via nerve blocks, epidural injections, and physical therapy, all in-office procedures. There was little if any medication management. In the early 1990's Pain Medicine changed drastically, attracting Physicians and Practitioners from different specialties. Various Medical Boards (including CA) and specialty boards declared pain the "Fifth Vital Sign" that was ignored or undertreated.   My office based practice average $150 to $200 per patient, which included nerve blocks or epidural injections. Newcomers to Pain Medicine (Surgeons, Radiologist, Physiatrists, etc.) turned the office based practice into a Surgery Center / Hospital Operating room practice. Injections and nerve blocks now incurred a $1200 to $1700 facility fee. Worker's compensation and insurance carriers eventually became reluctant to cover the increased cost and pushed for medication management of pain. At the same time Purdue, Janssen, Johnson & Johnson and other big Pharma instigated seminars to entice physicians to treat pain with their narcotic and related products. Seminars with renowned Physician speakers were held at exclusive resorts in Scottsdale, Az. and Las Vegas, Nv. Physician's travel, expense, room, board

along with an honorarium was covered by big Pharma. I attended six such seminars between 1992 and 1996. The main theme was that pain was undertreated and that the new formulated pain medications including narcotics were non-addictive and had tamper-proof enteric coatings to prevent abuse. History has proven this untrue.

My seminar visits to Las Vegas introduced me to the gambling bug and resultant addiction. The rise of HMO's, PPO's, and etc. caused a marked decrease in my office based practice. Medication management was being favored over nerve blocks and injections. I adjusted my practice accordingly. Surgeons and other practitioners now referred their "failed back surgery", pain syndrome, and hopeless case patients to me for medication management. On June 19, 2014 my office was raided by the DEA and Medical Board of California (MBC). January 2015 I enrolled and attended two courses at the UC-San Diego School of Medicine on Physician Prescribing and Medical Records Keeping.

Twice I was scheduled to appear before the California State Attorney, DEA, and MBC in 2016. Three events negated my appearance. My younger brother and sister passed away Feb. 12, 2016 and Dec. 16, 2016. I returned to Baltimore for their funerals. My attorneys at that time withdrew their representation of me. At the last minute I obtained a new attorney to represent me at the hearing during my absent. A compromise was reached, if I surrendered my medical license all matters would be laid to rest. I surrendered my medical license on Feb.23, 2016.

Despite the above compromise, I was arrested at my home by DEA agents and Las Vegas Metro police Feb. 2018. Due to failing health, I've not been able to seek non-medical employment. June 2018 with a complaint of pain of the chest and abdomen I was admitted to the hospital and diagnosed with Diabetes, Essential Hypertension, Anemia, Chronic Kidney Disease Stage , and three Aneurysms of the Thoracic and Abdominal Aorta. Jan. 2019 I underwent surgery for repair of one of the three aneurysms. The remaining two are to be evaluated for repair. August 21, 2019 our oldest daughter Brittney passed away, complications of pneumonia and respiratory failure.

I practiced medicine for over 30 years without incidents providing outstanding patient care. The final years of my practice was marred by gambling addiction and poor judgment. I pleaded guilty to two charges presented and take full responsibility for my actions. My office was only open two days a week and the amount of prescription being written indicates fraudulent prescriptions were also being issued by my office staff. My office, my staff, my prescription pad, my responsibility.

WENDELL MARK STREET

# WENDELL MARK STREET

DATE: September 06, 2023

## DIAGNOSES

1. Dermatitis (Vitiligo)
2. Diabetes
3. Essential Hypertension and Cardiomyopathy
4. Three Thoracoabdominal Aortic Aneurysms with surgeries for graft placement June 19, 2019 and December 14, 2022 post-op complicated by graft leak, which is being monitored by semi-annual CAT scans for possible repeat surgery.
5. Acute Eczema (Seborrheic Dermatitis)
6. Chronic Kidney Disease, Stage 3
7. Anemia due to Kidney Disease
8. Ventral Hernia
9. Gout

## PRESCRIPTION MEDICATIONS

1. Clonidine 0.5 mg QHS
2. Isosorbide ER 30 mg QAM
3. Carvedilol 25 mg TID
4. Hydralazine 50 mg TID
5. Bumex 2 mg BID
6. Valsartan 160 mg BID
7. Clopidogrel 75 mg QD
8. Aspirin Low EC 81 mg QD
9. Atorvastatin 40 mg QHS

## MEDICAL PROVIDERS

1. Dr. Thomas Tsung: Primary Care Physician  702.940.1571
2. Dr. Neel Dhudshia: Cardiothoracic Surgeon  702.970.4979
3. Dr. Fredric Siegel: Cardiologist 702.534.5464
4. Dr. Nauman Tahir: Renal (Kidney) 702.877.1887
5. Dr. Alyssa Oliver: Dermatology 702.588.6730

Oct 06, 2023

Wendell Street

## Finances

Social Security Monthly Income: $1863.00 (after Medicare deduction)

Spouse Monthly Income: $2000.00

2016 Cadillac CTS (Blue Book Value): $7500.00

2008 Toyota FJ Cruiser (Blue Book Value): $8500.00

## Monthly Bills

Rent: $1785.00

Auto Insurance: $298.00

Utilities: (Gas, Electric, Water, Phone, Trash Pickup) $450.00

Food / Grocery: $400.00



# UC San Diego
## SCHOOL OF MEDICINE

# Physician Certificate of Credit

**The University of California, San Diego School of Medicine Continuing Medical Education** certifies that

## Wendell Street, M.D.

has participated in the educational activity titled **Physician Assessment and Clinical Education Program**

## Medical Record Keeping Course

at the **Sheraton Mission Valley in San Diego, CA** on **January 29-30, 2015.**

This activity was designated for **17.00** *AMA PRA Category 1 Credits™.*

### CREDITS CLAIMED: 17

| Credit Approvals: | Number of Credits Approved: | |
|---|---|---|
| *AMA PRA Category 1 Credit(s)™* | Up to **17.00** | Physicians should only claim credit commensurate with the extent of their participation in the activity. |

William A. Norcross MD.

**William A. Norcross, M.D.**
**Professor and Director**
**Physician Assessment and Clinical Education Program**

Wendell Mark Street, MD.

**Participant Signature**



# UC San Diego
## SCHOOL of MEDICINE

## Physician Certificate of Credit

The University of California, San Diego School of Medicine Continuing Medical Education certifies that

### Wendell M. Street, M.D.

has participated in the educational activity titled **Physician Assessment and Clinical Education Program**

### Physician Prescribing Course

at the <u>Sheraton Mission Valley in San Diego, CA</u> on <u>January 26-28, 2015</u>.

This activity was designated for <u>27</u> *AMA PRA Category 1 Credits*™.

**CREDITS CLAIMED:** _27_

| Credit Approvals: | Number of Credits Approved: | | |
|---|---|---|---|
| *AMA PRA Category 1 Credit(s)™* | Up to | **27** | Physicians should only claim credit commensurate with the extent of their participation in the activity. |

William A. Norcross MD.

**William A. Norcross, M.D.**
**Professor and Director**
**Physician Assessment and Clinical Education Program**

Wendell Mark Street, M.D.

**Participant Signature**

## DSM-5 Diagnostic Criteria: Gambling Disorder

*\* For informational purposes only \**

A. Persistent and recurrent problematic gambling behavior leading to clinically significant impairment or distress, as indicated by the individual exhibiting four (or more) of the following in a 12-month period:

    a. Needs to gamble with increasing amounts of money in order to achieve the desired excitement.

    b. Is restless or irritable when attempting to cut down or stop gambling.

    c. Has made repeated unsuccessful efforts to control, cut back, or stop gambling.

    d. Is often preoccupied with gambling (e.g., having persistent thoughts of reliving past gambling experiences, handicapping or planning the next venture, thinking of ways to get money with which to gamble).

    e. Often gambles when feeling distressed (e.g., helpless, guilty, anxious, depressed).

    f. After losing money gambling, often returns another day to get even ("chasing" one's losses).

    g. Lies to conceal the extent of involvement with gambling.

    h. Has jeopardized or lost a significant relationship, job, or educational or career opportunity because of gambling.

    i. Relies on others to provide money to relieve desperate financial situations caused by gambling.

B. The gambling behavior is not better explained by a manic episode.

*Specify* if:

**Episodic:** Meeting diagnostic criteria at more than one time point, with symptoms subsiding between periods of gambling disorder for at least several months.

**Persistent:** Experiencing continuous symptoms, to meet diagnostic criteria for multiple years.

*Specify* if:

**In early remission:** After full criteria for gambling disorder were previously met, none of the criteria for gambling disorder have been met for at least 3 months but for less than 12 months.

In sustained remission: After full criteria for gambling disorder were previously met, none of the criteria for gambling disorder have been met during a period of 12 months or longer.

*Specify* current severity:

**Mild:** 4–5 criteria met.

**Moderate:** 6–7 criteria met.

**Severe:** 8–9 criteria met.

*From the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (section 312.31).*



# GAMBLING ADDICTION

## Making the Case for Sentencing Relief

BY ALAN ELLIS, MARK H. ALLENBAUGH,
ROBERT HUNTER, AND DOUGLAS C. CRAWFORD

When imposing a sentence, the US Sentencing Guidelines (USSG) instruct judges to consider and weigh two distinct aspects of the crime: "the nature and circumstances of the offense and the history and characteristics of the defendant." (18 U.S.C. § 3553(a).) These factors can be used to determine where within the guidelines range a sentence should be given, and whether and to what degree to depart from the guidelines (generally downward, rarely upward) if the offense or offender is otherwise outside the "heartland" of similarly situated offenders.

When promulgating and amending the guidelines, Congress specifically directed that they be "entirely neutral" as to "race, sex, national origin, creed, and socioeconomic status." (U.S. SENTENCING GUIDELINES MANUAL (USSG) ch. 5, pt. H, introductory cmt. (2014) (citing 28 U.S.C. § 994(d)).) However, the US Sentencing Commission was given authority to determine the relevancy of additional offender characteristics, and in so doing developed three distinct categories.

The first category is the prohibited group mentioned above; these factors are never to be considered when

Published in *Criminal Justice*, Volume 30, Number 3, Fall 2015. © 2015 by the American Bar Association. Reproduced with permission. All rights reserved.
This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

imposing a sentence. The second category contains those characteristics the commission has deemed relevant for sentencing purposes, and include conditions that may serve to determine whether a sentence is within the range or a departure from the range, or even the type of sanction to be imposed, e.g., prison versus probation. These include age, mental and emotional conditions, and physical condition. The third category contains those characteristics that are "not ordinarily relevant" but nevertheless could be in exceptional circumstances—drug or alcohol abuse being the primary example.

There is, however, a *sui generis* "fourth" category: gambling addiction. While Congress has never directed the commission to prohibit gambling addiction from consideration, the commission nevertheless has placed a per se ban on its use as a ground for a departure. According to USSG § 5H1.4, "Addiction to gambling is not a reason for a downward departure." The commission does not give any reason for this particular position or indicate why it has chosen to single out gambling addiction, as opposed to any other addiction, for such a ban. Further, when the commission first adopted this prohibition via emergency amendment 651 (effective November 1, 2003), it simply stated: "The Commission determined that addiction to gambling is never a relevant ground for departure." (USSG app. C, vol. II at 355 (amend. 651); USSG § 5K2.0(d)(1).)

Although gambling addiction currently cannot, in and of itself, serve as a ground for a departure from the guidelines (discussed further below) under USSG § 5H1.4, it can serve as a reason for departure pursuant to USSG § 5K2.13. Section 5K2.13 provides that "[a] downward departure may be warranted if (1) the defendant committed the offense while suffering from a *significantly reduced mental capacity*, and (2) the significantly reduced mental capacity *contributed substantially to the commission of the offense*" (emphasis added).

"Significantly reduced mental capacity" means the defendant, although convicted, has a greatly impaired ability to understand the wrongfulness of the offense behavior or to exercise the power of reason, or to control behavior that the defendant knows is wrongful. (USSG § 5K2.13 cmt. n.1.) Also, since 2005, it has been able to serve as a ground for a below-guidelines sentence, i.e., a downward variance.

**ALAN ELLIS** *practices in the areas of federal sentencing, prison matters, postconviction remedies, and international criminal law, with offices in San Francisco and New York. Contact him at AELawl@ alanellis.com or go to http:lalanellis.com.* **MARK H. ALLENBAUGH** *specializes in federal sentencing, China trade law, and manufacturing and industrial law, and is a former staff attorney for the US Sentencing Commission. Contact him at mark@allenbaughlaw.com or go to http:lallenbaughlaw.com.* **ROBERT HUNTER**, *Ph.D., is the founder and clinical director of the Problem Gambling Center in Las Vegas, Nevada, a nonprofit outpatient treatment facility for individuals suffering from gambling addiction.* **DOUGLAS C. CRAWFORD** *is a practitioner in a family law firm and recovering gambling addict who recently regained his license.*

A decade ago, in *United States v. Booker*, 543 U.S. 220 (2005), the US Supreme Court invalidated the guidelines if applied in a mandatory fashion as a violation of a defendant's Sixth Amendment right to actual notice of the penalty the defendant faced for the conduct charged. The Court therefore held in *Booker* that the guidelines now were to be considered as merely advisory, and, as a result, courts could vary downward from the guidelines (as opposed to depart from the guidelines—a distinction that will be discussed later). Such variances could be based on factors that otherwise could not serve as a basis for a departure.

This article explores the current definition of gambling addiction, why that particular condition is relevant for purposes of sentencing, and how the courts have recently addressed gambling addiction, and reviews methods for obtaining sentencing variances for clients diagnosed with gambling addiction.

## Gambling as a Disease

Despite a history of being viewed as a shortcoming of intelligence, control, or moral fiber, pathological gambling has been a recognized medical condition for more than three decades. It has been included in the *International Classification of Diseases* of the World Health Organization, as well as the primary authoritative publication addressing psychiatric illness, the *Diagnostic and Statistical Manual of Mental Disorders* of the American Psychiatric Association, currently in its fifth edition (*DSM-5*).

Gambling was first documented as a psychiatric illness in *DSM-III* (1980) and included in subsequent volumes through 2000, in which pathological gambling was listed as an "impulse control disorder" (diagnostic code 312.31). Well-known conditions, such as kleptomania, fall into this diagnostic category, which recognizes impulsive, usually negative, behaviors that occur for no rational reason.

The earliest professional proponent of recognizing gambling as an illness was Dr. Robert Custer, a psychiatrist who first voiced his views publicly in the mid-1970s, challenging the long-standing notion that gamblers were simply "degenerates." Custer was the individual mostly responsible for seeing that gambling first appeared in the *DSM* as a disease. A well-known and highly respected addiction professional and a key player in the early understanding of alcoholism as an illness, Custer played a critical role in the design of the Veterans Administration's addiction treatment models.

After meeting with and clinically interviewing gamblers (primarily members of Gamblers Anonymous) and their families, Custer came to the now proven but then revolutionary conclusion that for a percentage of the population, gambling is an addictive disease. He speculated that, at some point, a biological basis would be proven for this illness, and that it would turn out to be related in a substantial way to alcoholism and other substance addictions.

His predictions have proven to be incredibly accurate.

It has been scientifically and medically proven that gambling addiction is not, as former beliefs and stigmatisms held, simply the action of an impulsive or immoral

Published in *Criminal Justice*, Volume 30, Number 3, Fall 2015. © 2015 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

individual. It is a real biogenetic disease, occurring at the molecular level. Gambling addicts gamble the way an alcoholic drinks or a heroin addict shoots up—not impulsively, but in an all-consuming, life-controlling, and even life-threatening way. They are very ill, not impulsive.

**The science of gambling.** Modern medical science, particularly brain scan technology, has significantly advanced the understanding of gambling as an illness. Many top neurological and biological experts (most notably including Drs. Timothy Fong at UCLA and Marc Potenza at Yale) have demonstrated conclusively that, for a percentage of the gambling population (that percentage being a highly political number varying from 2–6 percent depending on research reviewed), gambling activates a different neurotransmitter response that is consistent with the response of an alcoholic drinking or a drug addict using drugs.

Some gamblers simply have a different brain relative to substance use. Gambling is viewed on a par with alcohol and drug addiction and is medically regarded as arising from the same neurological and biogenetic roots as alcohol and drug addiction. This is a significant departure from past views on gambling and one with implications for criminal attorneys and their clients.

## Gambling and the Guidelines

Despite the USSG's apparent disfavor toward at least certain mental and emotional conditions, courts are taking such factors into account, and departing downward for mental and emotional conditions—at least in part. According to the latest available Sentencing Commission data, in fiscal year 2014, there were 620 instances of downward departures or variances citing USSG § 5H1.3 or § 5K2.13 that did not involve a government motion for substantial assistance. (*See Commission Datafiles*, U.S.

## *Despite the USSG's apparent disfavor toward at least certain mental and emotional conditions, courts are taking such factors into account, and departing downward.*

gambling. The middle parts of their brains are different from nongamblers. The midbrain is a primitive but very powerful area of the brain that controls, among other things, the survival instinct. It is separate from and functions very differently than the frontal cortex, which governs decision making and the determination of right and wrong, honor, morality, and judgment.

Simply stated, in addicts, the levels of the brain chemical dopamine (the pleasure receptor) increase dramatically when the addiction is engaged. There is a measurable difference in chemical and electrical activity in the brain of the addict that is not present in nonaddicts. The addictive substance or behavior (gambling) essentially gives survival salience to the addiction, placing alcohol, drugs, or gambling on par with sleep, food, and reproduction. In effect, the midbrain overrides the rational and intelligent frontal cortex where good decisions are made and moral judgment resides. A part of the brain incapable of logic is directing an addict's behavior.

This is not to suggest that addicts are not responsible for their behavior. In fact, part of recovery from addiction involves accepting responsibility and making restitution. Individuals with the legitimate medical condition of addictive gambling are impaired. They are ill and in need of treatment—a fact that has begun to be legally addressed.

The most recent version of *DSM* (*DSM-5*, 2013) now lists gambling as "gambling disorder" and has moved it from impulse control disorders to the addictive disorders section, among similar disorders such as alcohol and

Sent'g Commission, http://tinyurl.com/q7s6z2a (follow "Fiscal Year 2014" hyperlink under "Individual Offender Datafiles").) Thus, departures or variances for mental or emotional conditions, while far from frequent, are not unheard of and most often involve drug, economic, or firearms offenses.

The commission, however, does not capture data on the number of instances where courts have granted downward departures or variances based specifically on gambling addiction. As influential judge and scholar Jack Weinstein of the Eastern District of New York observed over a decade ago, there also "is a dearth of cases addressing the question of whether a pathological gambling addiction can constitute a significantly reduced mental capacity" for purposes of a downward departure. (United States v. Liu, 267 F. Supp. 2d 371, 374 (E.D.N.Y. 2003).)

Since November 1, 2003, when the commission expressly ruled that "[a]ddiction to gambling is not a reason for a downward departure," USSG § 5H1.4, the authors could identify only six cases wherein the phrases "gambling addiction" and "sentencing guidelines" occur together with the terms "departure" or "variance." (*See* United States v. Quinn, 566 F. App'x 659 (10th Cir. 2014); United States v. Frazier, 547 F. App'x 729 (6th Cir. 2013); United States v. Logan, 542 F. App'x 484 (6th Cir. 2013); United States v. Dikiara, 50 F. Supp. 3d 1029 (E.D. Wis. 2014); Wosotowsky v. United States, No. 2:11-cr-00203, 2014 U.S. Dist. LEXIS 53488 (W.D. Pa. Apr. 17, 2014); United States v. McCloskey, No. 09-225, 2013 U.S. Dist. LEXIS

Published in *Criminal Justice*, Volume 30, Number 3, Fall 2015. © 2015 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.



## One Addict's Story

I arrived in Las Vegas in August 1984 and passed the Nevada Bar exam in 1985. After being mentored by several good lawyers, I founded my solo practice in 1989. As Las Vegas grew exponentially, my practice flourished. Unfortunately, as my income grew, so did my addiction to gambling. I was also abusing stimulants and alcohol.

By the early 2000s, I was gambling almost to the exclusion of all else. As of 2007, I had borrowed all the equity from real estate holdings accrued during the "bubble," taken my life savings, siphoned all income from the practice as it came in, and lost it all in the high-limit rooms of the casinos. The last money I could access was my client trust account. In six months, I lost all of that.

On May 1, 2007, the Nevada Supreme Court issued an order temporarily suspending me from the practice of law pending ethical charges from the state bar. After months of despondency and a failed suicide attempt, I entered the intensive outpatient program of the Problem Gambling Center operated by a leading expert on gambling addiction, Las Vegas psychologist Robert Hunter. His highly effective blend of brain science, peer counseling, and spiritual development provided insights that had eluded me in the past. I began a life in recovery and have not relapsed.

On February 22, 2008, I pleaded guilty to the ethical violations and was given a hearing to argue for a five-year suspension rather than permanent disbarment. I presented substantial evidence in mitigation, including expert testimony from Dr. Hunter. Citing fear of relapse and protection of the public, the ethics panel made a unanimous decision to permanently disbar me. I was devastated, but vowed that day to educate the bench, bar, and general public about the nature of my progressive, incurable, and often fatal disease.

I appealed the ethics panel decision to the Nevada Supreme Court on the grounds that the bar did not give sufficient weight to my gambling addiction as a mitigating factor. In a historic case of first impression in Nevada, the court unanimously reversed the state bar citing my gambling addiction as one of several mitigating factors and converted the disbarment to a five-year suspension. In 2013, I filed a petition for reinstatement and, despite vigorous opposition by the state bar, the ethics panel unanimously voted for reinstatement, which is currently pending approval by the Nevada Supreme Court.

After completing the center's intensive outpatient program, I was contacted by psychiatrist Rena Nora, chair of the Governor's Advisory Committee on Problem Gambling and another pioneer in the treatment of gambling addiction. Knowing my background, Dr. Nora appointed me to the Subcommittee on Legal Issues for the Advisory Committee in October 2008. Among other things, the subcommittee was directed to draft legislation creating a diversion program for gambling addicts who commit crimes in furtherance of their addiction. After months of meetings, research, and discussion (and thanks to the efforts of gaming attorney Anthony Cabot), the subcommittee drafted Assembly Bill 102. On February 27, 2009, I and other interested parties testified for passage of the bill in the Assembly Judiciary Committee of the Nevada State Legislature. Several months later, Nevada Revised Statutes (NRS) section 458A.200 was passed into law.

Three years after I entered recovery and two years after the ethics trial, the Clark County district attorney charged me with four counts of felony theft related to the misappropriation. Pursuant to plea negotiations, I pleaded guilty to two counts. I then filed a motion for diversion pursuant to NRS section 458A.200, the very statute I had helped draft years earlier. In what can only be described as an ironic twist of fate, Judge Donald Mosley of the Eighth Judicial District Court stayed adjudication and diverted me for treatment under the program. I became the first defendant in southern Nevada to be sentenced under the new statute. I have successfully completed the program, paid substantial restitution to my former clients, and continue to keep my disease in remission. Upon completion of my restitution, my conviction will be set aside.

I deeply and humbly apologize, as I have hundreds of times before, to my former clients for causing devastation in their lives. I also apologize to members of the bench, bar, and general public for the disgrace I brought to the profession of law. I respectfully ask that you try to understand my powerful and deadly disease. The central characteristic of gambling addiction is that the midbrain (which governs impulses such as eating, sleep, etc., and has no "conscience") hijacks the frontal cortex (which governs logical and moral functions) and creates intolerable actions like those taken by me. It is my sincere hope that by telling my story, judges who sentence gambling addicts for crimes committed in furtherance of their addiction will do so with better knowledge of the disease.

—*Douglas C. Crawford*

*Editor's Note: In June 2015, Douglas Crawford was reinstated to the bar by the Nevada Supreme Court. He is currently employed with a family law firm and working to pay full restitution to his former clients.*

Published in *Criminal Justice*, Volume 30, Number 3, Fall 2015. © 2015 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

168220 (W.D. Pa. Nov. 26, 2013).) Despite the dearth of case law, at least two of these cases provide significant guidance with respect to how gambling addiction still may fit within the rubric of the USSG.

In *United States v. Quinn*, the Tenth Circuit addressed whether gambling addiction still can serve as a ground for a departure despite being expressly ruled out in the guidelines. The defendant, an attorney, was convicted after a jury trial of seven counts of failing to pay employment taxes in violation of 26 U.S.C. § 7202. (*Quinn*, 566 F. App'x at 661.) At trial, part of Quinn's defense was that "her gambling addiction prevented her from making a rational decision to [willfully] refuse to pay" her employment taxes. (*Id.* at 662.) Quinn again raised her gambling addiction at sentencing in an effort to receive a downward departure or variance, claiming that "her severe depression caused her gambling problem which, in turn, blinded her to her legal responsibilities." (*Id.* at 670.) The district court denied her request for a departure or variance, and imposed a within-guidelines sentence of 36 months. (*See id.* at 669.)

Among Quinn's issues on appeal was whether the district

gambling addiction itself cannot serve as a ground for a downward departure, because it can be a substantial contributor to diminished capacity, a departure on that ground is appropriate.

Unfortunately for Quinn, the Tenth Circuit affirmed the district court with respect to all her claims of error: "The judge properly recognized a departure was unwarranted solely due to her gambling under the sections dealing with her mental and emotional condition." (*Id.* at 671.) Further, "he found neither her severe depression nor her gambling addiction to have contributed substantially to the commission of the offense." (*Id.* at 672.)

In *United States v. Dikiara*, the defendant, a 56-year-old married woman and first-time offender, pleaded guilty to one count of mail fraud pursuant to 18 U.S.C. § 1341. (50 F. Supp. 3d 1029, 1029 (E.D. Wis. 2014).) Over an 11-year period, the defendant, an office manager for an entertainment company, embezzled in excess of $1 million from her employer by forging the employer's name on checks made out to the defendant. "Defendant gambled away virtually all of the proceeds of her crime . . . . In

## *At least in the Tenth Circuit, gambling addiction's substantial contribution to diminished capacity can serve as grounds for a departure from the guidelines.*

court had erred by "denying a downward departure under USSG § 5H1.3 (mental and emotional conditions) or § 5K2.13 (diminished capacity)." (*Id.*) The Tenth Circuit began its analysis by observing that "[s]everal inter-related guideline provisions address the court's consideration of a downward departure due to mental and emotional conditions and diminished capacity." (*Id.* at 670.) The Tenth Circuit noted that USSG § 5K2.13 addresses a defendant's diminished capacity, even though USSG § 5H1.3 states that "[m]ental and emotional conditions are not ordinarily relevant" to departure considerations, and USSG § 5H1.4 expressly excludes gambling addiction as a reason for a downward departure. In other words, "[w]hile other departure requests based on mental and emotional conditions may be governed by [the general departure considerations and limitations set forth at] § 5K2.0, diminished capacity claims are governed solely by § 5K2.13." (*Id.* at 671 (internal quotation marks omitted).)

Accordingly, USSG § 5K2.13 "allows a downward departure [for gambling addiction] if the offense was committed while suffering from a significantly reduced mental capacity which 'contributed substantially to the commission of the offense.'" (*Id.* at 672 (citing United States v. Sadolsky, 234 F.3d 938, 942–43 (6th Cir. 2000) (affirming application of USSG § 5K2.13 based on gambling addiction)).) In short, at least in the Tenth Circuit, while

addition to the money she stole, defendant spent most of her husband's approximately $300,000 in retirement money[.]" (*Id.* at 1030.) As a result, the defendant and her husband lost their home to foreclosure. The guidelines sentencing range was calculated to be 41–51 months, with the government advocating for 41 months. The defendant sought a below-guidelines sentence of a year and a day.

In deciding to impose a sentence of 15 months, US District Court Judge Lynn Adelman focused extensively on the defendant's demonstrated gambling addiction. While acknowledging that USSG § 5H1.4 excludes gambling addiction as a ground for departure, Judge Adelman nonetheless observe that "such provisions are not binding on the court in determining the sentence under [18 U.S.C.] § 3553(a)." (*Id.* at 1033 n.1.) And so the court varied downward accordingly.

According to Judge Adelman, the "[d]efendant did not act out of a desire to harm her employer, nor did she steal in order to finance a lavish lifestyle. Virtually all of the money went to the casino. The records from the casino demonstrated substantial losses, which ate up not just the proceeds of the crime but also defendant and her husband's savings." (*Id.* at 1032.) Quoting an opinion by prolific author and sentencing scholar US District Court Judge Mark Bennett, Judge Adelman analogized gambling addiction to drug addiction: "'By physically hijacking the brain, addiction

Published in *Criminal Justice*, Volume 30, Number 3, Fall 2015. © 2015 by the American Bar Association. Reproduced with permission. All rights reserved.
This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.



diminishes the addict's capacity to evaluate and control his or her behaviors. Rather than rationally assessing the costs of their actions, addicts are prone to act impulsively, without accurately weighing future consequences.'" (*Id.* (quoting United States v. Hendrickson, 25 F. Supp. 3d 1166, 1174 (N.D. Iowa 2014) (Bennett, J.)).)

Further, and importantly, Judge Adelman also noted, as discussed above, that "[t]he American Psychiatric Association recently reclassified pathological gambling from an impulse control disorder to an addiction-related disorder." (*Id.* (citing Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders (DSM-5) 585 (5th ed. 2003); Ferris Jabr, *How the Brain Gets Addicted to Gambling*, Sci. Am., Nov. 5, 2013).) Accordingly, "[g]iven the impact of her gambling addiction, which was well-supported by the defense materials, a below range term sufficed to provide just punishment." (*Id.* at 1033.)

Thus, although there is a dearth of case law regarding gambling addiction in the context of federal sentencing, two recent federal cases provide some significant insight and direction for counsel when confronted with a client diagnosed with gambling addiction. As the Tenth Circuit held in *Quinn*, gambling addiction still may serve as a ground for a departure pursuant to USSG § 5K2.13 provided that the addiction substantially contributes to the defendant's diminished capacity. Additionally, as Judge Adelman made clear in *Dikiara*, counsel also may argue for a variance based on a client's demonstrated gambling addiction. As noted in *Dikiara*, though, what is more important is not only that any such addiction be "well-supported by the defense materials," but also that counsel is well-versed in the latest developments regarding gambling addiction, such as its recent reclassification as an addiction rather than a mere impulse control disorder.

### When a Client Shows Signs of a Problem

When a client appears to have a gambling problem, counsel is well advised to have him or her evaluated by a competent forensic mental health professional to determine (1) if he or she is a gambling addict, and (2) if so, whether there is a nexus between the disease and the offense.

It is important to understand that USSG § 5K2.13 (diminished capacity policy statement) application note 1 defines "significantly reduced mental capacity" to mean the defendant has a significantly impaired ability to (A) understand the wrongfulness of his or her behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful. This second prong is the volitional impairment test. Too many lawyers and judges misapprehend this. They often ask how a defendant can be suffering from diminished capacity while still able to operate a complex business or commit a sophisticated crime or even practice law. Because diminished capacity is an encouraged departure, *see, e.g.*, United States v. McBroom, 124 F.3d 533 (3d Cir. 1997), many more defendants qualify than quite a few lawyers and judges realize, in light of the volitional test.

Gambling addiction is a volitional disorder. This disease sometimes makes otherwise law-abiding individuals commit crimes—e.g., fraud, theft, etc.—to support their habit, much like a heroin junkie steals to support a habit. If an individual is capable of appreciating the nature, quality, and wrongfulness of certain acts but is unable to control his or her conduct due to a reduced mental capacity, USSG § 5K2.13 applies. Leniency is appropriate in such cases in determining diminished capacity because the purpose of § 5K2.13 is to treat with some compassion those in whom a reduced mental capacity has contributed to the commission of a crime. Leniency is appropriate because two of the primary rationales for punishing an individual by incarceration—retribution and deterrence—lose some of their relevance when applied to those with reduced mental capacity. The criminal justice system long has meted out lower sentences to persons who, although not technically insane, are not in full command of their actions. Persons who find it difficult to control their conduct do not—considerations of dangerousness aside—deserve as much punishment as those who act maliciously or for gain and avarice.

When possible, it is helpful to get the probation officer and the prosecutor on board. This does not necessarily mean that they wholeheartedly agree that your client is entitled to a downward departure, but merely that your position is not unreasonable. To this end, attorneys at the Law Offices of Alan Ellis have recently begun to meet with the probation officer, the prosecutor, and the case agents, accompanied by a forensic mental health professional to explain the expert's findings and answer their questions. This, coupled with an offer to have your client evaluated by an expert of the government's choice, can go a long way particularly if the government's expert agrees with yours.

Understand the disease so you can persuasively show the judge why it wrecked your client's life and caused the client to do what he or she did and explain what the client is now doing to rectify the situation. (*See* Alan Ellis, *Answering the "Why" Question: The Powerful Departure Grounds of Diminished Capacity, Aberrant Behavior and Post-Offense Rehabilitation*, 11 Fed. Sent'g Rep. 322 (1999); Alan Ellis, *Let Judges Be Judges! Post-Koon Downward Departures, Part 1: Diminished Capacity*, Crim. Just., Winter 1998, at 49.) If it can be demonstrated that your client has "stepped up to the plate," recognized his or her problem, done something about it, made significant efforts toward restitution, if applicable, and made substantial rehabilitative strides, the case may be on the road to a favorable outcome. ■

Published in *Criminal Justice*, Volume 30, Number 3, Fall 2015. © 2015 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.